**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

GORDON GRADO, M.D., et al.,

      Plaintiffs,

                                  Case No. 1:24-cv-158

      v.

                                  JUDGE DOUGLAS R. COLE

MEDICAL, INDUSTRIAL, AND
SCIENTIFIC PRODUCTS
CORPORATION, et al.,

      Defendants.

**<u>OPINION AND ORDER</u>**

This action is more than two years old. But it has not yet proceeded beyond the pleading stage. The delay largely resulted because two defendants, Jose Rodriguez and the company he owns—Medical, Industrial, and Scientific Products Corporation (MIS)—have refused to participate in the litigation. Now, Plaintiffs Gordon Grado, M.D., and the company he owns—Centro de Especialidad Oncologica (CdEO)—move for default judgment against MIS. (Doc. 50). Plaintiffs also move, in response to Rodriguez's recent failure to appear at a status conference, for the Court to sanction Rodriguez himself with an entry of default. (Doc. 55). But that's not all. A third group, Defendants/Cross-Claimants Suleiman A. Refaei and the company he owns—Jordan Medical Group, LLC (JMG)—also move for default judgment against both Rodriguez and MIS. (Doc. 53). Nor is that all that is hanging over Rodriguez's head. After he failed to appear at the October 16, 2025, in-person hearing, the Court issued a show

cause order that Rodriguez demonstrate good cause, in writing, why he should not be sanctioned with a default judgment. (10/31/25 Not. Order).

For his part, while the two motions for default judgment (and the show cause order) were pending, Rodriguez submitted three filings: exhibits, a response, and an objection. (Docs. 54, 56, 59). That led to Plaintiffs moving for clarification on the Court's show cause order, (Doc. 57), and Cross-Claimants moving to strike Rodriguez's final objection, (Doc. 60).

The Court addresses the whole mess in greater detail below. But, at bottom, Rodriguez and MIS have failed to plead or otherwise defend the claims brought against them. *See* Fed. R. Civ. P. 55(a). Rodriguez's most recent flurry of filings does not change that. So, the Court **GRANTS** Plaintiffs' Motion for Sanctions (Doc. 55) and **DIRECTS** the Clerk to enter default against Jose Rodriguez as to Plaintiffs' claims against him. Given that default, along with the earlier entry of default against MIS, the Court treats Plaintiffs' Motion for Default Judgment (Doc. 50) as directed at both Rodriguez and MIS. Ultimately, the Court **GRANTS IN PART** Plaintiffs' Motion for Default Judgment (Doc. 50) and conditionally **ENTERS JUDGMENT** for an amount to be determined at a later date. Similarly, the Court **GRANTS IN PART** Cross-Claimants' Motion for Default Judgment against Rodriguez and MIS (Doc. 53) and conditionally **ENTERS JUDGMENT** for an amount to be determined at a later date. Finally, the Court **DENIES** both Plaintiffs' Motion to Clarify Order to Show Cause (Doc. 57) and Cross-Claimants' Motion to Strike (Doc. 60) as **MOOT**.

## BACKGROUND

This case involves a dispute between three sets of parties, with each of the three sets consisting of an individual and an entity that the individual owns.[1] Now, two of those groups, Grado and Rafaei and their respective companies, seek default judgment against the third, Rodriguez and his company. (Docs. 50, 53). While the Court recounted some of Plaintiffs' allegations in its previous Opinions, (*see* Docs. 33, 43), it now does so in a slightly different posture (and adds Cross-Claimants' allegations). That is because when considering a motion for default judgment, the Court accepts as true all well-pleaded allegations, except those relating to the amount of damages. *See In re Cook*, 342 B.R. 384, 2006 WL 908600, at \*3 (B.A.P. 6th Cir. Apr. 3, 2006) (Table) (citations omitted). So, this time, the Court's summary of the factual background rests on the now-admitted allegations in Plaintiffs' Amended Complaint (Doc. 11), as well as those in Cross-Claimants' Answer (Doc. 36). After summarizing the parties' allegations below, the Court then recounts some of this case's long and winding procedural history.

### A.     Plaintiffs' Allegations.

At its core, this case arises out of the efforts by Dr. Grado and his company to acquire a linear accelerator machine (LINAC) for their oncology clinic in

---

[1] The three individuals are Gordon Grado, M.D., Jose Rodriguez, and Suleiman A. Refaei. Grado owns Centro de Especialidad Oncologica. Rodriguez owns Medical, Industrial, and Scientific Products Corporation. And Refaei owns Jordan Medical Group, LLC. In its recounting of the Background, the Court largely mirrors how the Amended Complaint and Answer refer to the parties. But the Court notes that each individuals' actions are also generally attributable to his respective corporate identity, and vice versa.

Aguascalientes, Mexico. (*See generally* Doc. 11). Rodriguez offered to help in that endeavor, claiming that he had in his possession just such a device. (*Id.* at #75). Indeed, "Rodriguez, personally and [on] behalf of MIS" told Grado and CdEO that "MIS owned title" and possessed a LINAC available "for immediate sale."[2] (*Id.*).

Relying on those representations (which later proved false), Grado personally executed a purchase agreement with MIS on June 5, 2020, agreeing to purchase the LINAC for $145,000.[3] (*Id.*; Purchase Agreement, Doc. 11-1, #90–92).[4] Grado planned to then transfer ownership of the LINAC from himself to CdEO (his company), and CdEO would use it to replace a broken machine at the clinic. (*See* Doc. 11, #78).

But his plan quickly hit a snag. That's because, even though Grado had paid in full, Rodriguez and MIS never delivered the LINAC. (*Id.* at #75–77). Indeed, it turns out that Rodriguez and MIS never even had one. (*Id.* at #76). Rather, Refaei and JMG did. (*Id.*). Without Grado's knowledge or consent, Rodriguez planned to take the money he received from Grado, transfer it to JMG to purchase JMG's LINAC, and then arrange delivery of the machine to CdEO with Grado none the wiser. (*Id.* at #76–77).

---

[2] Rodriguez made other representations as well. For example, that the LINAC had been "inspected," de-installed correctly, and "properly stored." (Doc. 11, #75).

[3] Rodriguez and MIS accepted that payment and then transferred some or all of it to Refaei and JMG. (Doc. 11, #77). Grado also ended up paying $4,000 in storage fees. (*Id.* at #75).

[4] The Court may rely on the Purchase Agreement, as well as the Sale Agreement and Third-Party Beneficiary Agreement described below. That's because (1) they are written instruments that are referenced and attached to the Amended Complaint, and (2) they serve as the basis for Plaintiffs' claims. *Anderson v. ABF Freight Sys., Inc.*, No. 1:23-cv-278, 2024 WL 51255, at *1 n.3 (S.D. Ohio Jan. 4, 2024); Fed. R. Civ. P. 10(c).

The Amended Complaint also suggests why Rodriguez may have engaged in this game of smoke and mirrors. Apparently, Grado had dealt with Refaei and JMG once before to procure medical equipment (according to Cross-Claimants, another LINAC, (Doc. 36, #287)). (Doc. 11, #76). That transaction went poorly. So Grado "determine[d] that he would never engage in dealings [with them] again." (*Id.*). As a result, when Grado sought out Rodriguez and MIS to procure the LINAC, he specifically told them that "he would not do business with Refaei or JMG." (*Id.*). That presumably led to Rodriguez declining to reveal how he intended to source the LINAC he had promised to Grado.

As this recounting should make clear, the Court is not suggesting that Rodriguez and MIS never intended to deliver a LINAC to Grado. In fact, Rodriguez and MIS entered into two agreements with Refaei and JMG in an effort to do just that: a Sale Agreement, (Doc. 11-2), and a Third-Party Beneficiary Agreement, (Doc. 11-3).[5] And the Third-Party Beneficiary Agreement specified that the LINAC was being kept in storage at 9823 Cincinnati Dayton Road, West Chester Township, Ohio. (Doc. 11-3, #97). (So far as the Court knows, it may still be there today.) So, at least based on these agreements, a LINAC did exist, and Rodriguez and MIS, along with Refaei and JMG, seemed to have a plan to deliver it to Grado.

---

[5] The Sale Agreement is dated July 22, 2020, (Doc. 11-2, #94), and the Third-Party Beneficiary Agreement October 12, 2020, (Doc. 11-3, #97), respectively.

But the plan went awry.[6] Grado never received a LINAC, nor did he receive a refund. (Doc. 11, #77). Rather, Refaei and JMG demanded he pay $25,000 *more*. (*Id.*). And once Grado became aware that Refaei and JMG were involved, that became its own separate problem; as already noted, Grado had previously disavowed any interest in transacting with them. (*Id.* at #76).

In the end, Grado and CdEO were forced to look elsewhere for a LINAC. (*See id.* at #78). The delays and separate business dealings to obtain that LINAC subjected them to additional regulatory hurdles and caused them to lose business and clientele in the interim. (*Id.*). Based on that, Plaintiffs asserted eight claims against Rodriguez and MIS: (1) breach of contract as to the Purchase Agreement (Count I); (2) fraudulent inducement (Count II); (3) negligent misrepresentation (Count III); (4) promissory estoppel (Count IV); (5) unjust enrichment (Count V); (6) fraudulent misrepresentation (Count VIII); (7) breach of contract as to the Sale Agreement and Third-Party Beneficiary Agreement (Count IX); and (8) civil conspiracy (Count X).[7] (*Id.* at #78–87).

After some difficulty effectuating service, (*see generally* Doc. 29), Plaintiffs finally managed to serve Rodriguez and MIS on October 2, 2024, (*see* Docs. 30, 31).

---

[6] MIS separately sued JMG and Refaei for failing to provide the LINAC to MIS for transfer to Grado, but the Court dismissed the case for failure to prosecute. (Doc. 33, #239; Order Dismissing Action for Failure to Prosecute, *Med., Indus. & Sci. Prods., Inc. v. Jordan Med. Grp., LLC*, No. 1:21-cv-555 (S.D. Ohio Oct. 18, 2022), Doc. 22).

[7] Plaintiffs also originally asserted seven claims against both Refaei and JMG, and one claim against JMG but not Refaei. (Doc. 11, #81–87). Of those eight total claims, the Court has dismissed four, but allowed four to proceed. (Doc. 33, #260–61). Those allegations are not deemed admitted for the purposes of this opinion.

That meant MIS had until October 23, 2024, to answer, but it did not do so. (Doc. 31). A few weeks later, Plaintiffs applied to the Clerk for entry of default against MIS, (Doc. 34), which the Clerk entered on November 21, 2024, (Doc. 37).

As for Rodriguez, he opted to proceed pro se and moved to dismiss. (Doc. 32). Finding Rodriguez's arguments wanting, the Court denied that motion. (Doc. 43). At the same time, because the Clerk had entered default against MIS nearly nine months earlier, and Plaintiffs had yet to move for default judgment, the Court advised Plaintiffs that if they failed to do so, the Court would dismiss the claims against MIS for want of prosecution. (*Id.* at #381–82). That prompted them to so move. (Doc. 50).

## B. Cross-Claimants' Allegations.

JMG and Refaei, meanwhile, tell the story a bit differently, and importantly, they have their own complaints about MIS and Rodriguez.[8]

JMG and Grado first met no later than 2018. (Doc. 36, #287). In fact, as noted above, JMG previously sold Grado a LINAC. (*Id.*). JMG met MIS and Rodriguez, by contrast, in late 2019. (*Id.* at #288). Then, in or around March 2020, in the ordinary course of its business, JMG acquired a LINAC from a medical center in North Carolina. (*Id.*). It purchased the unit with the intent of re-selling it, so JMG moved it to a climate-controlled, secure storage facility in West Chester, Ohio. (*Id.*).

A month before that purchase, MIS had advised JMG that MIS was "seeking to purchase a LINAC on behalf of multiple customers." (*Id.*). So it is perhaps no

---

[8] JMG and Refaei also assert counterclaims against Grado and CdEO. Those allegations, of course, are not deemed admitted for current purposes.

surprise that, on or about April 3, 2020, MIS agreed to purchase the LINAC from JMG on behalf of a client for a base price of $150,000, with JMG agreeing to pay MIS a 3% commission as a broker fee. (*Id.*). The parties did not memorialize the agreement in writing at that time. (*Id.*).

As noted above, the contract MIS and Grado entered in June for the sale of the LINAC had a sale price of $145,000. (*Id.* at #289). So, JMG says it agreed to lower its sale price to $145,000 in order to preserve and foster the business relationship between JMG, MIS, and Grado. (*Id.*). According to JMG (and contrary to what Grado says), "Grado knew at the time he entered into an agreement with MIS that JMG was the owner of the LINAC and that MIS would be purchasing the LINAC from JMG using funds Grado paid to MIS." (*Id.*). And, according to JMG, Grado never objected to JMG's involvement. (*Id.* at #290). JMG likewise was aware that MIS was acting as a broker for Grado. (*Id.*).

JMG also says that Grado began making installment payments to MIS for the LINAC, even though Grado's agreement with MIS called for a lump sum payment. (*Id.*). That was for a simple reason—Grado did not have the sum he agreed to pay MIS. (*Id.*). JMG did not know about this arrangement and would not have agreed to sell the LINAC to MIS if it had been aware that the payment would come over time, as it had other serious buyer inquiries. (*Id.*). So, JMG advised MIS that MIS had breached the agreement between them by failing to make a lump sum payment for the LINAC. (*Id.*). That led to Grado making repeated promises to timely pay the remaining balance. (*Id.*). In fact, on September 4, 2020, CdEO's manager Hugo Ruiz

8

personally called Refaei and advised him that Grado or CdEO would make the remaining payment. (*Id.*). But, while promises were forthcoming, payment was not. (*Id.*).

By October 12, 2020, Grado had paid MIS only $76,116, so that was all MIS had paid on to JMG. (*Id.* at #291). At that time, frustrated at both Grado's and MIS's failure to fulfill the purchase agreement, JMG agreed to a revised deal. (*Id.*). Under the new terms, JMG would accept a total of $130,000, plus storage fees, with JMG paying no commission to MIS. (*Id.*). MIS and JMG memorialized that agreement in writing and signed it on October 12, 2020. (*Id.*; Doc. 36-1, #304 (attaching contract)). Just two days later, MIS made good on the $130,000 promise by paying the remaining $53,844. (Doc. 36, #291). But that left the outstanding storage fees that JMG owed, which Grado, as the cause of the fees, purportedly had agreed to pay, but was going to pay them through MIS. (*Id.*).

In the October 12 contract itself, MIS agreed to pay JMG one thousand dollars per month for storage, retroactive to June for a total of $4,000. (*Id.* at #292). But MIS and Grado refused to actually make the storage payment until October 29, causing JMG to accrue another month's worth of fees. (*Id.*).

Despite that, JMG had a desire to see the deal through. So JMG sent MIS instructions on how to contact and access the storage facility for the purpose of transferring control of the LINAC. (*Id.*). But MIS never acted on that information and refused to sign an acknowledgment to take possession of the LINAC. (*Id.*).

And there was still another problem. MIS never paid the sales tax on the LINAC to JMG, presumably because Grado never paid it to MIS. (*Id.* at #293). Instead Grado, CdEO, and MIS cooked up a solution. They jointly presented JMG with a falsified tax-exempt certificate purporting to be from the State of Alabama that would allow them to avoid paying sales tax on the LINAC purchase. (*Id.*). JMG, suspicious, contacted the State of Alabama to confirm the certificate. (*Id.*). Alabama had no record of it. (*Id.*).

So, because of those three remaining problems—outstanding storage fees, MIS's indication that it would refuse to sign an acknowledgement when it took possession of the LINAC, and the fraudulent tax-exempt certificate—JMG contacted Grado and informed him that JMG could not transfer the LINAC to MIS. (*Id.* at #293–94). At that point, MIS's relationships with both Grado and JMG deteriorated. (*Id.* at #294). All the while, storage fees continued to accrue. (*Id.*).

But that still wasn't the end of it. Jacobus, the CEO of DOTMed, an unrelated party that had initially connected MIS and JMG, volunteered to help resolve the dispute. (*Id.*). Grado, MIS, and JMG all agreed to hear what Jacobus had to say. (*Id.*). Jacobus's proposed solution went like this: Grado would pay JMG directly another $15,000 in exchange for the LINAC, and MIS would make no profit from Grado. (*Id.*). Grado initially refused, but later agreed with JMG to pay $10,000 instead and to take possession of the LINAC and transport it to Mexico. (*Id.*). But Grado subsequently refused to accept the LINAC or make the payment. (*Id.*). Since that time, and despite JMG's repeated efforts, Grado has not taken possession of the LINAC (nor has MIS),

10

and it remains in storage,[9] accruing fees, waiting for Grado to pay for it and take possession. (*Id.* at #295).

Based on the above facts, Refaei and JMG bring four counterclaims against Grado and CdEO. (*Id* at #295–99). But more relevant here, they also bring crossclaims against Rodriguez and MIS. (*Id.* at #299–302). Those include (1) breach of contract, (2) promissory estoppel, and (3) indemnity for any potential liability to Grado or CdEO. (*Id.*).

## C.   Procedural History.

This case began on March 25, 2024. (*See* Doc. 1). In the intervening two years, despite filing several motions pro se, Rodriguez has yet to file an answer. MIS, the company for which Rodriguez admits he acts as President and CEO, has not appeared in Court at all.[10]

Some of this case's delay can be attributed to Plaintiffs' difficulty in serving Rodriguez and MIS. Indeed, service took nearly seven months and Plaintiffs only accomplished it after the Court permitted service by email. (*See* Docs. 28, 29, 30, 31).

After Plaintiffs served Rodriguez, he did respond initially—moving to dismiss. (Doc. 32). But finding his arguments largely meritless (and undeveloped), the Court denied that motion. (Doc. 43). That said, the Court ruled that one issue, whether

---

[9] At least it did at the time Cross-Claimants filed their answer.

[10] Rodriguez cannot appear pro se on behalf of the corporation, nor could MIS itself appear pro se. *Baker v. Bensalz Prods., Inc.*, 480 F. Supp. 3d 792, 798 n.3 (S.D. Ohio 2020) (citing *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 340 (6th Cir. 1984) ("The rule of this circuit is that a corporation cannot appear in federal court except through an attorney.")).

Plaintiffs' claims belong in arbitration, warranted further inquiry. (*Id.* at #371). So, the Court scheduled an in-person hearing to explore that question, specifically warning Rodriguez that failure to attend would risk the Court entering default judgment against him. (*Id.* at #357 n.1; 9/10/25 Notice of Hearing set for October 16, 2025). Rodriguez promised the Court he would attend. But on the appointed day, he didn't show. (*See* 10/16/25 Min. Entry).

So, the Court issued a Show Cause Order. (10/31/25 Not. Order). There, the Court gave Rodriguez 21 days to demonstrate good cause in writing why the Court should not sanction him with an entry of default judgment. (*Id.*). In the meantime, both Plaintiffs and Cross-Claimants pursued default judgment against him and MIS. (Docs. 50, 53).

In fact, those efforts began all the way back on November 13, 2024, when Plaintiffs Grado and CdEO applied for an entry of default against MIS after MIS failed to answer the Amended Complaint. (Doc. 34). The Clerk entered that default on November 21, 2024. (Doc. 37). But Plaintiffs did not apply for an entry of default against Rodriguez at that time, as his motion to dismiss was pending. (*See* Doc. 32). Next, on August 25, 2025, after some prompting by the Court, (*see* Doc. 43), Plaintiffs moved for default judgment against MIS, (Doc. 50). Then, after Rodriguez failed to appear for the hearing described above, Plaintiffs requested the Court enter an order of default against him as a sanction. (Doc. 55).

Cross-Claimants Refaei and JMG are also pursuing default judgment against both Rodriguez and MIS. As neither Rodriguez nor MIS ever answered their

crossclaims, Refaei and JMG applied for entry of default against them on September 5, 2025. (Doc. 51). The Clerk entered default three days later. (Doc. 52). Cross-Claimants then moved for default judgment. (Doc. 53).

Rodriguez filed a smattering of responses ostensibly opposing default. First, with no explanation, he filed various exhibits—including various proofs of payment, the parties' contracts, and filings from a previous arbitration and case between the parties. (Doc. 54). Next, he filed what he titles a "Pro Se Response of Jose A. Rodriguez in Opposition to Plaintiff and Cross-Claimants' Motions for Default Judgment." (Doc. 56). There, he seems to repeat many of the arguments he raised in his prior motion to dismiss. Finally, he filed what he styles an "Objection of Jose A. Rodriguez to Request for Entry of Default." (Doc. 59). That objection seems to consist of a repeat of his prior arguments, a declaration in support, and a re-filing of the exhibits. (*Id.*).

Understandably, those filings led to some confusion from the parties seeking default judgment. So Plaintiffs filed a motion to clarify, (Doc. 57), and Cross-Claimants filed a motion to strike Rodriguez's "Objection," (Doc. 60). All of the motions are now ripe.

## LEGAL STANDARD

Federal Rule of Civil Procedure 55 provides a two-step process for default judgment. A plaintiff seeking entry of default against a defendant must first show, "by affidavit or otherwise," that the defendant "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Upon such showing, the clerk must enter default. *Id.* And at that point, the complaint's factual allegations concerning liability, but not

damages, are taken as true. *Beaver v. Eastland Mall Holdings, LLC*, No. 2:20-cv-485, 2021 WL 1084610, at *2 (S.D. Ohio Mar. 22, 2021); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). Next, unless the claim "is for a sum certain or a sum that can be made certain by computation," the plaintiff must apply to the court for a default judgment. Fed. R. Civ. P. 55(b).

Before granting a default judgment, a court must satisfy itself of two things. First, the court must verify that it has both subject-matter jurisdiction over the action and personal jurisdiction over any defendant against whom it grants a default judgment. *See Am. Clothing Express, Inc. v. Cloudflare, Inc.*, No. 2:20-cv-2007, 2022 WL 256337, at *1 (W.D. Tenn. Jan. 26, 2022) (citing *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 889, 903 (6th Cir. 2006)). Second, the court must determine whether the facts in the complaint state a claim for relief against the defendant. *See Harrison v. Bailey*, 107 F.3d 870, 1997 WL 49955, at *1 (6th Cir. Feb. 6, 1997) (Table) (citing *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992)) ("Default judgments would not have been proper due to the failure to state a claim against these defendants."). Said differently, to warrant default judgment, "the complaint must be able to survive a Rule 12(b)(6) motion to dismiss." *Buxton v. Hartin Asset Mgmt., LLC*, No. 1:22-cv-600, 2023 WL 4861724, at *6 (W.D. Mich. July 31, 2023) (citation omitted).

After confirming there is jurisdiction and a plausible claim, a court then "must conduct an inquiry" to establish the appropriate damages. *Beaver*, 2021 WL 1084610,

14

at *2 (citation omitted). To do that, the court may either hold an evidentiary hearing, Fed. R. Civ. P. 55(b)(2), or it may determine damages without a hearing "if the damages are capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits," *Beaver*, 2021 WL 1084610, at *2 (citation and internal quotation marks omitted). And, if additional evidence is required, but the parties do not yet have it in their possession, the Court can award default judgment, while reserving to a later time the question of the amount of that judgment. *See, e.g.*, *Sinmier, LLC v. Everest Indemnity Ins. Co.*, No. 3:19-cv-2854, 2021 WL 5961625, at *2 (N.D. Ohio Dec. 16, 2021) (granting default judgment on liability for indemnification but finding that damages "cannot be determined until this matter has substantially concluded").

## LAW AND ANALYSIS

Before diving into the question of default judgment, the Court starts by observing that the Clerk correctly entered default on behalf of the Plaintiffs against MIS, and on behalf of the Cross-Claimants as to both MIS and Rodriguez. Under Federal Rule of Civil Procedure 12(a) a defendant must respond within 21 days of being served a complaint. Plaintiffs served MIS (and Rodriguez) on October 2, 2024. (Docs. 30, 31). MIS has not answered. Cross-Claimants, meanwhile, served Rodriguez on November 14, 2024, and MIS on August 14, 2025. (Doc. 36. #303; Doc. 49). Neither has responded. So the Clerk correctly entered default. (Docs. 37, 52).

So that brings us to the remaining matters here. First, whether the Court should enter default in Plaintiffs' favor against Rodriguez as a sanction. And second,

15

whether the Court should enter default judgment against Rodriguez and MIS—an analysis that involves consideration of jurisdiction and whether movants state a claim. But before addressing those two issues, the Court starts with a brief detour to address a threshold question—the role, if any, that Rodriguez's recent filings in opposition should play in the Court's analysis.

## A.    Rodriguez's Objections to Default are Meritless.

As noted above, Rodriguez submits three separate filings opposing default judgment. (Docs. 54, 56, 59). They are meritless, so the Court does not discuss them long. First, the Court notes that both Plaintiffs and Cross-Claimants seek default judgment against MIS, not just Rodriguez. But Rodriguez is a pro se litigant, not a lawyer, so he cannot object to default on behalf of a corporation. *Baker*, 480 F. Supp. 3d at 799 n.3 (citing *Doherty*, 728 F.2d at 340). So even if his arguments on behalf of the company were meritorious, it would not prevent judgment against MIS.

In any event, his various filings also fail for other reasons. The first is simply a collection of "exhibits" without explanation, so the Court finds it unpersuasive. (*See generally* Doc. 54). Regarding the other two, the Court notes that it is difficult to parse what exactly Rodriguez is responding to with each. But even very generously construing them (to prevent them from being duplicative) as a response in opposition to the motions for default judgment, (Doc. 56), and a response in opposition to the motion for sanctions respectively, (Doc. 59), they are untimely under this Court's rules. That is because a party must file a memorandum in opposition within 21 days after the date of service of a motion. S.D. Ohio Civ. R. 7.2(a)(2). Rodriguez did not.

16

Rodriguez's November 17, 2025, filing purports to respond to both motions for default judgments but he filed it some 84 days after Plaintiffs' Motion for Default Judgment, and 55 days after Cross-Claimants'. (Doc. 56). And his December 8, 2025, "objection" fares no better. (Doc. 59). He filed it 39 days after Plaintiffs' Motion for Sanctions (Doc. 55) and 38 days after the Court's Show Cause Order (10/31/25 Not. Order), the last in time filings on the docket to which Rodriguez can claim to be responding. So both responses are clearly untimely under the rules.

And finally, the Court has examined the two responses and finds them wanting. They do not refute the pending motions for default judgment, nor do they demonstrate good cause under Federal Rule of Civil Procedure 55(c) for setting aside the default. Rather, they simply repeat the same arguments—factual disputes, personal jurisdiction, venue, compelled arbitration, and piercing the corporate veil— that he argued in his Motion to Dismiss (Doc. 32). The Court denied those arguments then and finds them no more persuasive here. (Doc. 43).

In sum, Rodriguez's three filings are without merit and so the Court proceeds with its default judgment analysis. And because of that, the Court **DENIES** Plaintiffs' Motion to Clarify Order to Show Cause (Doc. 57) and Cross-Claimants' Motion to Strike (Doc. 60) as **MOOT**.

## B.     The Court Grants Plaintiffs' Request for Sanctions and Enters Default Against Rodriguez.

The Court takes care of one more procedural matter before evaluating the motions for default judgment on their merits. As described above, the Court ordered Rodriguez to appear at an in-person status conference on October 16, 2025. (*See* Doc.

17

43, #357 n.1; 9/10/25 Notice of Hearing). Indeed, the Court explicitly warned that his failure to do so would risk the Court entering default judgment against him. (Doc. 43, #357 n.1). So when he did in fact fail to show, Plaintiffs requested the Court to do just that—enter default against him as a sanction. (Doc. 55). Still, the Court gave Rodriguez one last shot, ordering him to show good cause in writing why he should not be sanctioned with default judgment. (10/31/25 Not. Order). And as the Court just discussed, Rodriguez's two responses simply regurgitated his arguments from his failed motion to dismiss. The responses did not show good cause.

"Federal Rule of Civil Procedure 16(f) provides that a Court may 'issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party … fails to appear at a … pretrial conference' or 'fails to obey a scheduling or other pretrial order.'" *Bds. of Trs. of Ohio Laborers' Fringe Benefit Programs v. Akron Insulation & Supply, Inc.*, No. 2:15-cv-2864, 2017 WL 749202, at *1 (S.D. Ohio Feb. 27, 2017) (citing Fed. R. Civ. P. 16(f)(1)). And applicable here, Federal Rule of Civil Procedure 37(b)(2)(A)(vi) permits "rendering a default judgment against the disobedient party" as a proper sanction. So, because of Rodriguez's failure to appear at the October 16, 2025, in-person status conference, coupled with the Court's specific warning regarding the consequences of any such failure to appear, the Court **GRANTS** Plaintiffs' Motion for Sanctions (Doc. 55). The Clerk is directed to enter default against Rodriguez as to Plaintiffs' claims.[11]

---

[11] The Court also notes that it denied Rodriguez's Motion to Dismiss on August 5, 2025, (*see* Doc. 43), and Rodriguez has still not answered Plaintiffs' First Amended Complaint. So, at

18

Accordingly, in the below analysis, the Court treats Plaintiffs' Motion for Default Judgment against MIS as being against Rodriguez as well.

## C.     Default Judgment Is Warranted on Some Claims but Not Others.

The remaining question is whether the Court should enter the requested default judgments. To do so, the Court must address whether it has jurisdiction and whether the parties seeking default judgment have stated viable claims. The Court takes them in that order.

### 1.     The Court Has Jurisdiction Over This Matter.

Jurisdiction does not pose a hurdle here. Start with subject-matter jurisdiction. Both movants demonstrate diversity jurisdiction over their claims. (Doc. 50, #406; Doc. 53, #427). MIS is an Alabama corporation with its principal place of business in Illinois, (Doc. 11, #73; Doc. 36, #300), and Rodriguez, its owner, is a citizen of Brazil, (Doc. 36, #300), (or possibly Illinois, (Doc. 11, #73)). Grado, by contrast, is a citizen of Arizona, while CdEO (his company) is incorporated in Mexico. (*Id.*; Doc. 36, #286–87). And Refaei, for his part, is a citizen of Ohio, as is his company, JMG, an LLC whose only member is Refaei. (Doc. 36, #299). So there is complete diversity all the way around.[12] And both Plaintiffs and Cross-Claimants seek amounts in excess of

---

this point, Plaintiffs could have applied to the Clerk for an entry of default and secured it against Rodriguez.

[12] Because there is complete diversity between the non-foreign entities—Plaintiff Grado (Arizona), and Defendants Refaei (Ohio), JMG (Ohio), MIS (Alabama) and Rodriguez (possibly Illinois)—the addition of other foreign parties—CdEO (Mexico) and Rodriguez (if he is a citizen of Brazil)—does not destroy diversity. *See* 28 U.S.C. § 1332(a)(3).

$75,000. (Doc. 11, #79; Doc. 36, #287). So the Court has subject-matter jurisdiction under 28 U.S.C. § 1332.

Now turn to personal jurisdiction. First, the Court notes that it has already ruled that it has specific personal jurisdiction over Rodriguez. (Doc. 43, #371–77). The analysis as to MIS is the same, but the Court briefly recaps. The "critical question" in specific personal jurisdiction cases is whether "the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." *Arnold v. CooperSurgical, Inc.*, 681 F. Supp. 3d 803, 815 (S.D. Ohio 2023) (quoting *Third Nat'l Bank v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989)). MIS "purposefully availed [itself] of the privilege of conducting business in the state of Ohio," *id.*, by entering an agreement to purchase, and pay the storage fees for, a LINAC located in Ohio, (Doc. 11, #77; Doc. 36, #288–89). So there are sufficient minimum contacts with Ohio for this Court to have specific personal jurisdiction over MIS (and Rodriguez) for disputes relating to that LINAC. Thus, the Court has personal jurisdiction over both Defendants for the claims here.

### 2.  Plaintiffs Plausibly Allege Some of Their Claims, But Not Others.

Satisfied that the Court has jurisdiction over Plaintiffs' claims, the Court turns to whether they have stated a claim for relief against MIS. For the claims sounding in contract, the Court finds that Plaintiffs sufficiently allege their first breach of contract claim, but not their second. Nor do they allege their unjust enrichment or promissory estoppel claims. Regarding the tort claims, Plaintiffs successfully plead

their fraudulent inducement and conspiracy claims, but not their fraudulent or negligent misrepresentation claims.

*Breach of Contract*

Plaintiffs assert two breach of contract claims against Rodriguez and MIS—Counts I and IX. (Doc. 11, #78–79, 85–86). Count I alleges that Defendants breached the purchase agreement they entered with Plaintiffs. (*Id.* at #78–79). "In Ohio, '[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach.'" *Finesse Express, LLC v. Total Quality Logistics, LLC*, No. 1:20-cv-235, 2021 WL 1192521, at *6 (S.D. Ohio Mar. 30, 2021) (citing *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019)). Plaintiffs successfully allege a contract—i.e., the purchase agreement where they agreed to purchase a LINAC from MIS for $145,000, (*see* Doc. 11, #78; Doc. 11-1, #90–92 (Purchase Agreement)); that they performed their end of the bargain, (Doc. 11, #78 ("Dr. Grado fully performed his obligations under the Purchase Agreement by issuing the payment in the full amount.")); that Rodriguez and MIS breached by failing to deliver the LINAC, (*id.*); and that they were damaged by not receiving the machine, (*id.*). So Plaintiffs are entitled to Default Judgment on this claim.

Count IX alleges that Rodriguez and MIS also breached their agreement with JMG, of which Grado was a third-party beneficiary. (*Id.* at #85–86). "Under Ohio law, in order to state a breach-of-contract claim as a third-party beneficiary, the plaintiff must allege that a promisee under the contract specifically intended for him to benefit

21

from the contract." *RLFShop, LLC v. Am. Express Co.*, No. 3:17-cv-405, 2018 WL 4030544, at *3 (S.D. Ohio Aug. 23, 2018) (citing *Laverick v. Children's Hosp. Med. Ctr. of Akron, Inc.*, 540 N.E.2d 305, 309 (Ohio Ct. App. 1988)). Plaintiffs successfully allege that they (or at least Grado) were the intended beneficiary of MIS's agreement with JMG to acquire the LINAC. Indeed, the agreement, which Plaintiffs attached to the Amended Complaint, specifically named providing the LINAC to Dr. Grado as the reason for the agreement. (Doc. 11-2, #94). But Plaintiffs do not plausibly allege that Rodriguez and MIS breached. Sure, Plaintiffs allege that JMG defaulted on the agreement in failing to deliver the LINAC to Rodriguez and MIS so they could in turn deliver it to Plaintiffs, but as JMG is not the one in default, those allegations are not admitted. (Doc. 11, #86). And all Plaintiffs allege as to Rodriguez and MIS is that "to the extent Rodriguez and MIS defaulted on or breached the Third Party Agreements as has been claimed by JMG in the past … Dr. Grado and C[d]EO have been damaged in the amounts paid for the LINAC." (*Id.*). The problem with that approach is that *Iqbal* and *Twombly* instruct the Court to ignore legal conclusions masquerading as facts. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). True, the Plaintiffs of course allege that Rodriguez and MIS did not deliver the LINAC to them, but they offer no explanation for *how* that conduct breached the third-party contract, especially considering the fact that they blame JMG for not delivering the LINAC to MIS. So they do not succeed on this claim.

22

*Unjust Enrichment*

Plaintiffs also assert a claim for unjust enrichment. "To state a claim for unjust enrichment in Ohio, Plaintiffs must plausibly allege that (1) they conferred a benefit on the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Duff v. Centene Corp.*, 565 F. Supp. 3d. 1004, 1028 (S.D. Ohio 2021) (citing *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (1984)). Based on the same facts as Count I's breach of contract claim, these elements are easily established. Plaintiffs allege that Rodriguez and MIS accepted full payment (and more) for the LINAC, but did not deliver the machine. And Rodriguez and MIS unjustly retained the payments.

However, because "[u]nder Ohio law, a plaintiff may not recover under the theory of unjust enrichment when an express contract covers the same subject," the Court only enters default judgment as to the breach of contract claim. *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp. 2d 892, 904 (S.D. Ohio 2013) (citing *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 799 (6th Cir. 2009)). So, the Court denies default judgment on this claim.

*Promissory Estoppel*

Plaintiffs also move for default judgment on Count IV, their promissory estoppel claim against Rodriguez and MIS. "To properly state a claim for promissory estoppel, a plaintiff must prove (1) the existence of a clear and unambiguous promise, (2) that was relied upon by the party to whom the promise was made, (3) where such

reliance was reasonable and foreseeable, and (4) where there was an injury resulting from the reliance." *Haas v. TruPartner Credit Union, Inc.*, No. 1:22-cv-678, 2024 WL 3925724, at *4 (S.D. Ohio Aug. 22, 2024) (citing *O.E. Meyer Co. v. BOC Grp.*, No. E-99-002, 2000 WL 234549, at *17 (Ohio Ct. App. March 3, 2000)). But here, that claim has a problem similar to the unjust enrichment claim. In Ohio, promissory estoppel can be an alternate theory of recovery, but "the existence of a valid and enforceable contract 'generally' precludes a claim of promissory estoppel arising from claims related to the contract." *Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043, at *18 (S.D. Ohio Mar. 6, 2018) (citation omitted). So, Ohio courts "permit promissory estoppel claims to be pleaded alternatively to breach of contract claims, although damages cannot be awarded for the same wrong under both claims." *Id.* (citation omitted).

Plaintiffs' Count IV is based on Rodriguez and MIS's promise to sell them a LINAC in exchange for $145,000. (Doc. 11, #81). The parties memorialized that promise in the purchase agreement. (*See* Doc. 11-1). So Plaintiffs cannot prevail on their promissory estoppel claim either.

*Fraudulent Inducement and Fraudulent Misrepresentation*

Plaintiffs' Count II brings a fraudulent inducement claim against Rodriguez and MIS, while Count VIII brings a fraudulent misrepresentation claim against all Defendants. (Doc. 11, #79, 84). At the outset, the Court finds that because the general fraud claim against all Defendants is based on the same allegations as the fraudulent inducement claim against Rodriguez and MIS, the Court denies default judgment on

24

Count VIII against Rodriguez and MIS as subsumed in the inducement claim.[13] Indeed, under Ohio law, both these claims share the same elements, with inducement having the added fact of inducing a contract. *Aero Fulfillment Servs. Corp. v. Oracle Corp.*, 186 F. Supp. 3d 764, 775 (S.D. Ohio 2016) ("A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the [agreement] or other wrongful conduct induced a party to enter into the [agreement]."). So, "a plaintiff must demonstrate the same elements necessary to prove a traditional action for fraud, including: (1) a representation, or where there is a duty to disclose, concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent to mislead another into relying on it; (5) justifiable reliance; and (6) a resulting injury." *Id.* (citing *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007)).

The misrepresentations that Plaintiffs point to here are that Rodriguez and MIS owned the LINAC in question, were in possession of the LINAC and able to provide it to Plaintiffs for immediate sale, had inspected the LINAC and found it in excellent condition, had properly stored the LINAC, and intended to conceal the truth regarding LINAC's true ownership (JMG) to induce Plaintiffs' purchase of it. (Doc. 11, #75). These allegations sufficiently plead a fraudulent inducement claim, as they allow the Court to plausibly infer the presence of all required elements. True, as this is a fraud claim, they must also satisfy the particularity requirement of Federal Rule

---

[13] That does not foreclose Plaintiffs from maintaining this claim against the other defendants.

of Civil Procedure 9(b). *See Aero Fulfillment*, 186 F. Supp. 3d at 776. But the Court finds that requirement met here as well.

*Negligent Misrepresentation*

Plaintiffs allege adequate facts to state their negligent misrepresentation claim (Count III) but run into the same hurdle as some of their previous claims. Here, Plaintiffs rely on the same misrepresentations and omissions as their intentional fraudulent inducement claim against MIS and again meet all the required elements. (Doc. 11, #80). But, while a plaintiff may allege both intentional and negligent fraud in the alternative, he cannot collect damages on both. That is "[b]ecause a defendant cannot be found to have committed an act both intentionally and negligently." *Bush Truck Leasing, Inc. v. Cummins, Inc.*, No. 1:18-cv-871, 2021 WL 9057624, at *5 (S.D. Ohio Apr. 13, 2021) (citing *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1269 (Ohio Ct. App. 1996)). So, the Court declines to grant default judgment on this claim.

*Civil Conspiracy*

Plaintiffs allege that all Defendants (including Rodriguez and MIS) conspired with each other to fraudulently induce Plaintiffs to sign the purchase agreement (Count X). (Doc. 11, #86). To state a claim for civil conspiracy, a plaintiff must allege: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 604 F. Supp. 2d 1128, 1153 (S.D. Ohio 2009) (citing *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d

26

28, 33 (Ohio Ct. App. 1993)). Plaintiffs meet these elements. They allege that MIS and JMG (along with Rodriguez and Refaei) conspired to induce Plaintiffs to enter the purchase agreement. (Doc. 11, #76–77). Specifically, they committed the act of intentionally withholding the LINAC's true ownership from Plaintiffs. (*Id.*). And that injured Plaintiffs by inducing them to enter a contract which Rodriguez and MIS did not honor.

In sum, Plaintiffs are entitled to default judgment on Count I, breach of contract; Count II, fraudulent inducement; and Count X, civil conspiracy. The Court denies default judgment as to the rest.

### 3. Cross-Claimants Properly Allege Two of Their Three Claims.

The Court now turns to JMG's crossclaims and ultimately concludes that they are entitled to default judgment on Count I, breach of contract and Count III, indemnity.

*Breach of Contract*

Cross-Claimants assert a single claim (Count I) for breach of contract against MIS (but not Rodriguez). (Doc. 36, #300). Once again, "[i]n Ohio, '[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach.'" *Finesse Express*, 2021 WL 1192521, at *6 (citation omitted). JMG and Refaei establish those elements. While Cross-Claimants allege that they entered multiple agreements with MIS, they move for default judgment on the final, October 12, 2020, agreement with MIS, where JMG agreed to sell the

LINAC to MIS in exchange for payment of $130,000, sales and state taxes, $1,000 per month in storage fees, and a 1.5% late fee. (Doc. 53, #430; Doc 36, #291–92; Doc. 36-1, #304 (attaching agreement)). Cross-Claimants have attached the contract, so that establishes the first element. (Doc. 36-1, #304). They allege their performance—they were ready and willing to transfer ownership of the LINAC to MIS, (Doc. 36, #292)—and allege breaches by MIS: the scheme involving a falsified certificate to avoid paying sales tax and the refusal to sign an acknowledgement to take possession of the LINAC, (*id.* at #292–93). Due to those breaches, JMG never received full payment, could not sell the LINAC to other buyers, and accrued storage fees. (*Id.* at #295). So Cross-Claimants also establish damages, although how much, since JMG appears to have retained the amounts Rodriguez and MIS paid, remains to be determined.

*Promissory Estoppel*

Cross-Claimants also move for default judgment on their promissory estoppel claim (Count II), (Doc. 36, #301; Doc. 53, #430–31), against Rodriguez and MIS, but run into the same problem as Plaintiffs above. Cross-Claimants' promissory estoppel claim is based on Rodriguez and MIS's promise to pay them $130,000 for the LINAC, in addition to sales taxes, state taxes, $1,000 per month for storage fees, and 1.5% late fee. (Doc. 36, #301). That promise is in the October 12, 2020, contract. (*See* Doc. 36, #291). So despite pleading the elements of promissory estoppel, Cross-Claimants cannot prevail on that claim.

*Indemnification*

Cross-Claimants also move for default judgment on a claim for indemnification against Rodriguez and MIS (Count III). (Doc. 36, #301–02; Doc. 53, #431–32). Specifically, they seek to be indemnified by Rodriguez and MIS "for any costs, expenses, and liability incurred by JMG … as a result of this action." (Doc. 36, #302). That includes if JMG or Refaei are eventually found liable to Grado or CdEO, "because any liability on the part of JMG [or] Refaei would be a direct result of the primary liability of MIS and Rodriguez." (*Id.*). Notably, Plaintiffs have several outstanding claims against Cross-Claimants in this matter.

"Indemnity 'is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement.'" *Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 222 N.E.3d 621, 627 (Ohio 2023) (quoting *Worth v. Aetna Cas. & Sur. Co.*, 513 N.E.2d 253, 256 (Ohio 1987)). In Ohio, indemnity can be either implied or express. JMG and MIS's agreement did not contain an express indemnity provision, so Cross-Claimants argue implied indemnity. (Doc. 36, #302). "This implied right of indemnity arises when the party seeking indemnity is totally free of fault, and the fault of another party has been imputed to the party seeking indemnity." *Krasny-Kaplan Corp. v. Flo-Tork, Inc.*, 609 N.E.2d 152, 154 (Ohio 1993) (citation omitted).

Taking Cross-Claimants' allegations as true, the Court finds that they have sufficiently pleaded this claim. In their telling, JMG remained ready and willing to sell and transfer the LINAC to MIS (and by extension to Plaintiffs). The only reason that did not happen was MIS and Rodriguez's breaches—nonpayment and refusal to

29

work with JMG to transfer control of the LINAC. So, the Court determines that Cross-Claimants were "free of fault" and Rodriguez and MIS were instead the cause of any potential liability. Accordingly, the Court grants default judgment on this claim.

### D. Damages.

Because both groups of movants have stated successful claims, the Court turns to the final matter—damages. Remember, to determine damages, the Court may either hold an evidentiary hearing, Fed. R. Civ. P. 55(b)(2), or it may determine damages without a hearing "if the damages are capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits," *Beaver*, 2021 WL 1084610, at *2 (citation and internal quotation marks omitted).

But here, both Plaintiffs and Cross-Claimants state that not all relevant damages can be determined at this time. (Doc. 50, #415–16; Doc. 53, #433). Plaintiffs assert that their damages are not readily ascertainable at this stage as discovery has not begun and so request that the Court hold an evidentiary hearing after they conduct expert discovery. (Doc. 50, #415–16). Separately, because Plaintiffs' purchase agreement with Rodriguez and MIS provides that the prevailing party will recover its costs and expenses, including its attorneys' fees, Plaintiffs request the Court defer its determination of that award until after litigation of all remaining claims. (*Id.* at #416). Cross-Claimants, on the other hand, state that while their breach of contract (and promissory estoppel) damages are readily ascertainable, damages related to its indemnification claim cannot be determined until after Plaintiffs' claims are resolved.

(Doc. 53, #433). Based on that, Cross-Claimants request the Court defer determination of damages and schedule an evidentiary hearing once Plaintiffs' claims against them are resolved. (*Id.*).

The Court agrees and "finds that a determination as to the amount of damages is premature." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Bradshaw*, No. 1:24-cv-937, 2025 WL 1707925, at *5 (N.D. Ohio June 18, 2025). The parties at a later date may reach out to the Court to set an evidentiary hearing or to apply for damages pursuant to Rule 55.

## CONCLUSION

For the above-stated reasons, the Court **GRANTS** Plaintiffs' Motion for Sanctions (Doc. 55) and **DIRECTS** the Clerk to enter default against Jose Rodriguez as to Plaintiffs' claims. Furthermore, the Court **GRANTS IN PART** Plaintiffs' Motion for Default Judgment against Rodriguez and MIS (Doc. 50) and conditionally **ENTERS JUDGMENT** for an amount to be determined at a later date. Similarly, the Court **GRANTS IN PART** Cross-Claimants' Motion for Default Judgment against Rodriguez and MIS (Doc. 53) and conditionally **ENTERS JUDGMENT** for an amount to be determined at a later date. Finally, the Court **DENIES** both Plaintiffs' Motion to Clarify Order to Show Cause (Doc. 57) and Cross-Claimants' Motion to Strike (Doc. 60) as **MOOT**.

**SO ORDERED.**

May 7, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

31